IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JOHN W. RIVERS,** : | CIVIL ACTION NO. 3:20-CV-246 |
| : | |
| **Plaintiff** : | (Judge Conner) |
| : | |
| v. : | |
| : | |
| **BOROUGH OF OLYPHANT,** : | |
| **C.J. MUSTACCHIO**, individually : | |
| and in his official capacity, and : | |
| **JAMES DEVOE**, individually and : | |
| in his official capacity, : | |
| : | |
| **Defendants** : | |

### MEMORANDUM

Plaintiff John W. Rivers commenced this action against his employer, the Borough of Olyphant ("Borough"); its Solicitor and Manager, C.J. Mustacchio; and its Police Chief, James DeVoe.  Rivers asserts, pursuant to 42 U.S.C. § 1983, that defendants violated his rights to free association and free speech.  Defendants move to dismiss Rivers' claims under Federal Rule of Civil Procedure 12(b)(6).  For the reasons set forth below, we will grant defendants' motion and dismiss Rivers' complaint with leave to amend.

**I.      Factual Background & Procedural History**

Rivers has been employed by the Borough as a regular part-time police officer for 20 years.  (Doc. 1 ¶ 17).  The Borough's police department employees are represented by a labor union, Teamsters Local 229 ("Local 229").  (See id. ¶ 15). At all relevant times, the Borough and Local 229 have been parties to a collective bargaining agreement ("CBA").  (Id. ¶ 16).  Rivers has served as a Union Steward

for Local 229 since 2012.  (Id. ¶ 18).  In that capacity, Rivers has been involved in negotiations regarding wages, scheduling, and other working conditions; has filed grievances on behalf of himself and other union members; and has criticized some of the Borough's policies.  (See id. ¶ 19).

In April and July 2016, Rivers filed grievances against the Borough asserting that it had made inappropriate, unilateral changes to the shift-selection procedure in the Police Department.  (Id. ¶ 20).  An arbitration hearing was held in May 2017, (id. ¶ 25), and the arbitrator sustained Rivers' 2016 grievances in an award issued July 5, 2017, (id. ¶¶ 26-27).  Rivers alleges that the Borough took certain negative actions against him while his 2016 grievances were pending.

Rivers first alleges that, on January 10, 2017, he attended a civil service hearing in his capacity as Union Steward.  (See id. ¶ 56).  At the hearing, Rivers criticized the Borough for administering a civil service test with incorrect answers and scores which were changed after the test.  (See id.)  Rivers requested that the results of the civil service test be discarded and that another test be given.  (Id. ¶ 59).  The Borough denied his request.  (See id. ¶ 60).

Rivers also alleges that the Borough hired a full-time probationary police officer to work only the third shift in late spring 2017.  (See id. ¶¶ 29, 31).  This action precluded Rivers from working the third shift as he had for 17 years.  (See id. ¶ 32). According to Rivers, the Borough "made this scheduling change solely to punish [him] due to his leadership position in local 229 [and] the filing of the 2016 grievances."  (Id. ¶ 36).

Rivers filed a grievance in May 2017 regarding the Borough's refusal to provide a newly hired probationary police officer with certain bargained-for protections under the CBA. (Id. ¶¶ 38-39). The Borough failed to respond to this grievance even though the chief of police was required, under the CBA, to attempt to resolve the issues raised therein and issue a decision within 20 days. (Id. ¶ 40).

On June 29, 2017, Local 229 filed an unfair labor practice charge against the Borough with the Pennsylvania State Labor Board regarding the Borough's actions. (Id. ¶ 37; Doc. 1-6). The charge concerned both the purportedly retaliatory new hire and the Borough's failure to respond to the May 2017 grievance. (See Doc. 1-6 at 4-7). The charge was settled with the Borough paying a monetary award to Rivers. (Doc. 1 ¶ 42).

Rivers' complaint next addresses events that took place beginning in September 2019. On September 4, 2019, Rivers filed a grievance challenging what he perceived to be another improper shift-selection process implemented by the Borough.[1] (See id. ¶ 47). He claimed that the new process impacted only him and that it resulted in him losing 90 shifts, in violation of his CBA seniority rights. (Id. ¶¶ 45-46; see Doc. 1-8). Rivers alleges that Chief DeVoe warned him "not to file the grievance[], stating 'once you go down this path, there's no turning back.'" (Doc. 1 ¶ 50). Rivers further alleges that, instead of addressing the grievance, Chief DeVoe wrote to Borough Council and requested that Rivers be punished. (Id. ¶ 48). Rivers

---

[1] The complaint fails to specify when the challenged process began or whether it was a continuation of the change challenged by Rivers in 2017. (See Doc. 1 ¶¶ 43-45).

3

avers that Chief DeVoe's letter to Borough Council was "littered with inaccuracies." (Id. ¶ 49). The Borough, through Solicitor Mustacchio, issued a written warning to Rivers on October 3, 2019. (Id. ¶ 51; Doc. 1-10).

Rivers also complains about a five-day suspension he received on September 8, 2019. (See Doc. 1 ¶ 52; Doc. 1-11). The suspension evidently dealt with what time Rivers was permitted to leave his shift. Rivers alleges that he had a longstanding practice of leaving his shift at 6:30 a.m. (Doc. 1 ¶ 52). The Borough suspended him for five days for leaving at this time, asserting that Rivers was leaving his shift early. (See Doc. 1-11). Rivers filed a grievance regarding this suspension on October 8, 2019. (Doc. 1 ¶ 53; Doc. 1-11).

Rivers commenced this action on February 14, 2020. He asserts claims for violation of his First Amendment rights to freedom of association (Count I) and freedom of speech (Count IV) against Chief DeVoe, Solicitor Mustacchio, and the Borough, as well as claims for maintaining an unconstitutional custom or policy (Count II) and failure to train (Count III) against the Borough alone. Defendants move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). The motion is fully briefed and ripe for disposition.

## II.     Legal Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6). When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable

4

reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  In addition to reviewing the facts contained in the complaint, the court may also consider "exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint, the court conducts a three-step inquiry.  See Santiago v. Warminster Township, 629 F.3d 121, 130-31 (3d Cir. 2010).  In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" Id. at 130 (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded.  Id. at 131-32; see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief." Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 556.  A claim is facially plausible when the plaintiff pleads facts "that allow[]

5

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

### III. Discussion

Defendants challenge each of Rivers' four claims on the merits. They also seek dismissal of the individual-capacity and official-capacity claims against Chief DeVoe and Solicitor Mustacchio as well as Rivers' claim for punitive damages. Our analysis begins and ends with defendants' merits arguments.

#### A. Free Association & Free Speech

Rivers brings his constitutional claims under 42 U.S.C. § 1983. Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials. 42 U.S.C. § 1983. The statute is not a source of substantive rights, but serves as a mechanism for vindicating rights otherwise protected by federal law. See Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a Section 1983 claim, plaintiffs must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law." Kneipp, 95 F.3d at 1204 (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)). No question exists that the defendants are state actors. The only question is whether Rivers has pled a plausible violation of his First Amendment rights.

Rivers' free-association and free-speech claims are evaluated under the same set of elements. A plaintiff alleging retaliation based on exercise of either of these First Amendment rights must prove that (1) they engaged in "constitutionally protected conduct," (2) the defendant took "retaliatory action sufficient to deter a

person of ordinary firmness from exercising [their] constitutional rights," and (3) there is a "causal link" between the protected conduct and the retaliatory action. Baloga v. Pittston Area Sch. Dist., 927 F.3d 742, 752 (3d Cir. 2019) (quoting Palardy v. Township of Millburn, 906 F.3d 76, 80-81 (3d Cir. 2018)). Although governed by the same rubric, Rivers' "pure" association claim based on union membership "must be analyzed separately" from his free-speech claim arising from particular union-related speech. See id. at 748-49 (citing Palardy, 906 F.3d at 80-81).

        1.    ***Free Association***

Rivers first asserts that defendants retaliated against him for his labor union membership and for his leadership role within that union. "Plainly efforts of public employees to associate together for the purpose of collective bargaining involve associational interests which the first amendment protects from hostile state action." Labov v. Lalley, 809 F.2d 220, 222–23 (3d Cir. 1987). "And because a union's ability to file grievances on behalf of its members is essential to its collective bargaining power, retaliation against a union leader for the union's decision to file a grievance—as distinct from retaliation based on the substance of the grievance—constitutes retaliation based on association rather than on speech *per se*." Baloga, 927 F.3d at 754 (citation omitted).

The trouble with Rivers' claim, as currently pled, is that he fails to allege any facts suggesting that the cited retaliatory actions were causally connected to his union membership and leadership role, as opposed to "his advocacy on any particular issue." See Palardy, 906 F.3d at 81. Rivers alleges that he has been a union member for 20 years, that he has served as Union Steward since 2012, and

that he has previously filed grievances on behalf of other union members in that leadership role. To illustrate his assertion, Rivers alleges that he filed grievances in April 2016 and July 2016 on behalf of all regular part-time police officers, including himself, and that he filed a grievance on behalf of a newly hired probationary police officer in May 2017. (See Doc. 1 ¶¶ 20, 38-39). Rivers further alleges that, in January 2017, he appeared at a civil service hearing "in his capacity as Union Steward and on behalf of himself and his fellow Local 229 members" and criticized certain aspects of the Borough's civil service test. (Id. ¶ 56).

There is no question that Rivers' actions in his capacity as Union Steward in 2016 and 2017 constitute protected activity that could support a "pure" association retaliation claim. See Baloga, 927 F.3d at 754-55; see also Briggs v. Potter County, 787 F. App'x 123, 130 (3d Cir. 2019) (nonprecedential) (citing Baloga, 927 F.3d at 755; Palardy, 906 F.3d at 83-84). But Rivers must also plead a causal link between those activities and the claimed retaliatory action, *viz*, Rivers' scheduling disputes and five-day suspension in September 2019.[2] To meet this element, Rivers must show

---

[2] Rivers also intimates in his complaint that the scheduling change implemented by the Borough in June 2017, when a new full-time officer was hired, was made "solely to punish Officer Rivers due to his leadership position in Local 229 [and] the filing of the 2016 grievances." (Doc. 1 ¶ 36). Defendants correctly contend (and Rivers seemingly concedes) that, because the instant complaint was filed in February 2020, the two-year statute of limitations for Section 1983 claims would preclude a claim based on the June 2017 scheduling change. (See Doc. 10 at 6; Doc. 22 at 12); see also Garrett v. Wexford Health, 938 F.3d 69, 84 n.19 (3d Cir. 2019) (citing Sameric Corp. of Del. v. City of Philadelphia, 142 F.3d 582, 599 (3d Cir. 1998)). And even if we were able to consider this purportedly retaliatory action, the complaint offers no facts, only Rivers' conclusory assertion, to establish a causal link between the scheduling change and Rivers' union membership and activities.

8

that his protected conduct "was a 'substantial' or 'motivating factor' in the allegedly retaliatory conduct." Baloga, 927 F.3d at 759 (quoting Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000)). Rivers can make this showing by articulating either (1) "an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action" or (2) "a pattern of antagonism coupled with timing." Id. (quoting Lauren W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007)).

      We agree with defendants that Rivers has not shown a causal link between the events in 2019 and his membership in and leadership role within Local 229. Timing alone is not "unusually suggestive" here: Rivers' suspension postdates his most recent union leadership activities by more than two years. Cf. Baloga, 927 F.3d at 759-60 n.15 (one week between union leader's activities and retaliatory transfer is unusually suggestive, whether on its own or in conjunction with "evidence of . . . animus toward the union more generally") (citations omitted); Briggs, 787 F. App'x at 130-31 (jury could find union steward's termination while pursuing grievance on behalf of another union member to be unusually suggestive). Nor has Rivers alleged "a pattern of antagonism coupled with timing" between his 2016 and 2017 leadership activities and the 2019 scheduling issues and suspension. See Baloga, 927 F.3d at 759 (quoting Lauren W., 480 F.3d at 267). To the contrary, the complaint says nothing at all about Rivers' interactions with defendants during this intervening period.

      Moreover, Rivers offers no allegations suggestive of a general anti-union animus on the part of the defendants. Rivers does allege that Chief DeVoe made comments indicative of retaliatory intent on September 8, 2019, but the complaint

links those comments directly to Rivers' September 4, 2019 grievance, not to his earlier union leadership activities or to his union membership more generally. (See Doc. 1 ¶¶ 47-51). Specifically, he alleges that Chief DeVoe wrote to Borough Council "demanding that [Rivers] be punished" for grieving a change in the shift-selection procedures that affected Rivers alone. (Id. ¶¶ 45-48). Rivers also alleges that Chief DeVoe "warned . . . Rivers not to file" the grievance and cautioned that "once you go down this path, there's no turning back." (Id. ¶ 50). These allegations go to Rivers' free-speech claim, suggesting that he was retaliated against "because of his advocacy on a[] particular issue." See Palardy, 906 F. 3d at 81. But they do not form the basis of an association claim—that is, they do not permit an inference that Rivers was retaliated against "simply because of his union membership." See id. For all of these reasons, we will grant defendants' motion to dismiss Rivers' free-association claim.

      **2.**    *Free Speech*

Rivers invokes two events as the alleged protected activities underlying his free-speech claim: his filing of a grievance in September 2019 about a change in shift-selection procedures, and his testimony in his capacity as Union Steward during a January 2017 hearing about the civil service test. Defendants challenge these two activities on separate grounds, contending that Rivers fails to plead that he engaged in constitutionally protected speech as to his 2019 grievance and that he fails to plead causation as to the 2017 hearing. We address these issues *seriatim*.

### a. The 2019 Grievance

Rivers claims that he engaged in protected speech by complaining about the Borough's unilateral shift-selection and bidding process, which Rivers viewed as a seniority violation under the CBA. Rivers filed a grievance addressing these issues on September 4, 2019.

Public employees do not forfeit the First Amendment right to speak on matters of public concern by virtue of public employment. See Connick v. Myers, 461 U.S. 138, 142 (1983). That right, however, must be balanced against the public employer's interest in the effective discharge of its public duties. Id. As noted above, the first element that Rivers must allege to properly assert a free-speech retaliation claim is that he engaged in constitutionally protected speech. Not all public-employee speech is protected by the First Amendment; therefore, a public employee asserting a First Amendment speech violation must allege speech that is in fact protected by the Constitution. Baldassare v. New Jersey, 250 F.3d 188, 195 (3d Cir. 2001).

For a public employee's speech to be protected by the First Amendment, it must be on a matter of public concern, and the employee's interest in the speech must outweigh the interest of the employer in efficiently conducting its operations. See Connick, 461 U.S. at 146–54; Baldassare, 250 F.3d at 194–95. Whether speech meets these dual requirements is a question of law to be resolved by the court. See Baldassare, 250 F.3d at 195. In determining whether a statement was on a matter of public concern, context matters greatly: courts must consider "the employee's motivation as well as whether it is important to our system of self-government that

11

the expression take place," Munroe v. Cent. Bucks Sch. Dist., 805 F.3d 454, 467 (3d Cir. 2015) (citing Azzaro v. County of Allegheny, 110 F.3d 968, 978 (3d Cir. 1997) (*en banc*); Versarge v. Township of Clinton, 984 F.2d 1359, 1364-65 (3d Cir. 1993)), by looking to "the content, form, and context" of the statement, see id. (quoting Miller v. Clinton County, 544 F.3d 542, 550 (3d Cir. 2008)).  The Third Circuit Court of Appeals has explained that, generally, "[p]ersonal grievances, complaints about conditions of employment, or expressions about other matters of personal interest . . . are matters more immediately concerned with the self-interest of the speaker as employee."  Palardy, 906 F.3d at 83 (citation and quotation marks omitted) (alteration in original).

Defendants argue that Rivers' complaints regarding the police department's shift-selection and bidding process are not matters of public concern but merely personal grievances raised solely because of the effect they had on Rivers.  We are constrained to agree.  It is clear from the complaint that Rivers' speech was chiefly concerned with the *personal* implications of losing 90 shifts because of the shift-selection changes.  Rivers admits that he "was the only officer negatively impacted by the Borough's decision to ignore the bargained for process of shift selection by allowing a probationary officer to take shifts Officer Rivers would have successfully bid in the past."  (Doc. 1 ¶ 45).  And while Rivers intimates in his complaint that these changes had taxpayer implications in that they "forc[ed] the Borough to pay officers overtime," (id. ¶ 34), there is no reference to those implications in the grievance, nor is there any indication that Rivers' concerns were anything other than personal, (see Doc. 1-8).  Because Rivers' speech is not alleged to have touched

12

on matters of public concern, it is not constitutionally protected. We will thus grant defendants' motion to dismiss this aspect of Rivers' free-speech claim.

### b.     Speech Regarding Civil Service Examination

Rivers also asserts that he engaged in protected activity when he attended a January 2017 hearing and criticized the Borough for administering a civil service test with incorrect answers and scores which were changed after the test. At the hearing, Rivers requested that the results of the civil service test be discarded and that another test be given. Rivers made these statements "in his capacity as Union Steward and on behalf of himself and his fellow Local 229 members." (Doc. 1 ¶ 56).

Defendants challenge this claim on causation grounds alone.[3] As noted *supra*, in the absence of other evidence, causation can be shown by alleging either "unusually suggestive" timing between the protected speech and the retaliatory action or "a pattern of antagonism coupled with timing." Baloga, 927 F.3d at 759 (quoting Lauren W., 480 F.3d at 267). Rivers' complaint does not tie any specific retaliatory conduct to his January 2017 testimony; rather, it appears that he is proceeding on a pattern-of-antagonism theory, claiming the Borough "considered" his testimony "when it decided to embark on a concerted effort to violate the terms of the CBA, the right of Officer Rivers protected by it[,] and more specifically the

---

[3] Because Rivers fails to respond to defendants' causation argument in his opposition brief, (see generally Doc. 22), the court has discretion to deem the argument unopposed. We nonetheless address the question of causation on the merits.

13

right of Officer Rivers as set forth above." (Doc. 1 ¶ 63).  With regard to pattern of antagonism, the court of appeals has explained that

> [w]here the time between the protected activity and adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee, or other types of circumstantial evidence, such as inconsistent reasons given by the employer for terminating the employee or the employer's treatment of other employees, that give rise to an inference of causation when considered as a whole.

Marra v. Phila. Housing Auth., 497 F.3d 286, 302 (3d Cir. 2007) (internal citation and accompanying text omitted).

      Having carefully reviewed the complaint, we find that Rivers has not alleged a pattern of antagonism adequate to support an inference of retaliation.  Instead of a "pattern," Rivers' complaint identifies two temporally distinct clusters of events that he believes are indicative of retaliatory animus.  The first is the Borough's decision in June 2017—six months after Rivers' testimony at the January 2017 hearing—to hire a full-time probationary police officer to work the shift that Rivers had worked for 17 years, and its decision around the same time to ignore a grievance Rivers filed concerning the probationary officer.  (See Doc. 1 ¶¶ 28-40).  But Rivers himself eliminates any causality inference as to these events, which he explicitly links to his 2016 grievances and not his 2017 speech.  (See id. ¶¶ 28, 36).  There is then a 27-month gap before we reach the actions underlying Rivers' claim: the scheduling issues and his five-day suspension in September 2019.  (See id. ¶¶ 43-53).  The complaint is silent about this intervening period, offering no indication

that Rivers experienced "actual antagonistic conduct or animus," nor any other indicia that the claimed adverse actions were related to his speech. See Marra, 497 F.3d at 302.

The temporal chasm between Rivers' January 2017 speech and defendants' September 2019 conduct is too attenuated to support an inference of retaliation based on timing alone. See, e.g., Watson v. Rozum, 834 F.3d 417, 423 (3d Cir. 2016) (holding that two years between protected First Amendment activity and adverse action "is just too remote to suggest a retaliatory motive"). And Rivers' complaint is devoid of facts indicative of anti-speech animus or antagonism during the intervening period from which we might infer that his suspension was related to his speech. Indeed, the complaint provides no information at all about what may or may not have happened during those interim years. We thus hold that Rivers has failed to plead the causation element of his free-speech claim, and we will grant defendants' motion to dismiss.

### B. Municipal Liability

In addition to his claims against the individual defendants, Rivers asserts two claims against the Borough: he claims that the Borough "developed and maintained a number of deficient policies and/or customs which caused the deprivation of [his] constitutional rights," (Doc. 1 ¶ 72), and that the Borough failed to adequately train its employees, causing them to violate his constitutional rights, (id. ¶ 77).

Municipalities and other local governments are "persons" for Section 1983 purposes, see Monell v. Dep't of Social Servs., 436 U.S. 658, 690 (1978), but such entities are not responsible for every constitutional tort inflicted by their employees,

15

Connick v. Thompson, 563 U.S. 51, 60 (2011). To bring a Section 1983 claim against a municipality, the plaintiff must show that he was "deprived of 'rights, privileges, or immunities secured by the Constitution and laws,' and that the deprivation of those rights was the result of an official government policy or custom." Mulholland v. Gov't Cty. of Berks, 706 F.3d 227, 238 (3d Cir. 2013). Our court of appeals has explained that, to prove liability, a plaintiff must demonstrate that the municipal policy or custom was itself unconstitutional or was the "moving force" behind the claimed constitutional deprivation. Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014) (citation omitted). If the challenged policy or custom is not facially unconstitutional, a plaintiff can establish causation "only by demonstrating that the municipal action was taken with deliberate indifference as to its known or obvious consequences"—in other words, "[a] showing of simple or even heightened negligence will not suffice." Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000) (quoting Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 407 (1997)).

A plaintiff may bring a policy-based Monell claim for an alleged failure to train employees. Thomas, 749 F.3d at 222. A failure-to-train claim requires the plaintiff to show that the alleged training deficiency amounts to "deliberate indifference" to the constitutional rights of individuals who will encounter those employees. See id. (quoting Carter v. City of Philadelphia, 181 F.3d 339, 357 (3d Cir. 1999)). This standard is demanding—it requires evidence that the municipality "disregarded a known or obvious consequence" of its deficient training program. Connick, 563 U.S. at 61 (quoting Brown, 520 U.S. at 410). The alleged training

16

deficiency must be closely related to the constitutional injury suffered by the plaintiff. Id.

Ordinarily, a pattern of prior constitutional violations will give notice to a municipal actor that existing training or policies are constitutionally problematic, and continued adherence to the original practices will demonstrate the "conscious disregard" required to establish deliberate indifference. See Thomas, 749 F.3d at 223 (citation omitted); see also Berg, 219 F.3d at 276. In rare situations, however, the need to act may be "so obvious" that failing to do so could rise to the level of deliberate indifference even without a pattern of prior violations. Thomas, 749 F.3d at 223 (quoting City of Canton v. Harris, 489 U.S. 378, 390 n.10 (1989)); see also Berg, 219 F.3d at 276 (same).

Defendants argue that Rivers' municipal liability allegations are conclusory at best and that his claims must be dismissed on that basis. Having reviewed the complaint and discerned little factual support for these claims, we are inclined to agree. However, we find that Rivers' municipal liability claims must be dismissed for a more fundamental reason: Rivers has not pled an underlying constitutional harm.

Constitutional injury is a prerequisite for a municipal liability claim; that is, absent an underlying deprivation of a plaintiff's constitutional rights, municipal liability will not lie. See Mulholland, 706 F.3d at 238 n.15 (citations omitted); Startzell v. City of Philadelphia, 533 F.3d 183, 204 (3d Cir. 2008) (quoting Brown v. Commw. of Pa., Dep't of Health Emergency Med. Servs. Training Inst., 318 F.3d 473, 482 (3d Cir. 2003)). While it is possible for a municipality to be held liable even

17

when none of its employees are, "there still must be a violation of the plaintiff's constitutional rights." Brown, 318 F.3d at 482 (citing Collins v. City of Harker Heights, 503 U.S. 115, 122 (1992)).

We held *supra* that Rivers has failed to plead a First Amendment violation based on his union membership or any protected speech. Without an underlying constitutional violation, the municipal-liability claims also fail. See Mulholland, 706 F.3d at 238 n.15 (citations omitted); Startzell, 533 F.3d at 204 (quoting Brown, 318 F.3d at 482). Accordingly, we will grant defendants' motion to dismiss Rivers' claims against the Borough.

### C.   Leave to Amend

The Third Circuit Court of Appeals requires district courts to grant leave to amend in civil rights cases if a curative amendment is conceivable. See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002). The deficiencies requiring dismissal of Rivers' complaint are factual rather than legal in nature and thus are conceivably curable. Indeed, most of the problems outlined in this memorandum are the result of opaque pleading which inhibits our ability to draw inferences that might otherwise support Rivers' claims. Accordingly, we will grant Rivers leave to file an amended complaint.

**IV.     Conclusion**

For the reasons set forth herein, the court will grant defendants' motion to dismiss Rivers' complaint for failure to state viable First Amendment retaliation claims. We will, however, grant Rivers leave to amend to cure the deficiencies identified in his complaint. An appropriate order shall issue.

/S/ Christopher C. Conner
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:     October 9, 2020