# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN W. RIVERS, | : | CIVIL ACTION NO. 3:20-CV-246 |
| Plaintiff | : | (Judge Conner) |
| v. | : | |
| BOROUGH OF OLYPHANT and JAMES DEVOE, individually and in his official capacity, | : | |
| Defendants | : | |

## **MEMORANDUM**

Plaintiff John W. Rivers asserts claims against his employer, the Borough of Olyphant, Pennsylvania, ("the Borough"), and its Police Chief, James DeVoe, for alleged violations of his First Amendment rights to free association and free speech. The court dismissed Rivers' initial complaint for failure to state a claim upon which relief may be granted. Rivers amended his complaint, and defendants again move to dismiss. Defendants also move for summary judgment as to all claims raised in the amended complaint. We will grant defendants' motion to dismiss, and deny their motion for summary judgment as moot.

I.  **Factual Background & Procedural History**[1]

Rivers has been employed by the Borough as a regular part-time police officer for 20 years. (See Doc. 26 ¶ 15). The Borough's police department employees are represented by a labor union, Teamsters Local 229 ("Local 229"). (See id. ¶ 13). At all relevant times, the Borough and Local 229 have been parties to a collective bargaining agreement ("CBA"). (Id. ¶ 14). Rivers has served as a Union Steward for Local 229 since 2012. (Id. ¶ 16). In that capacity, Rivers "has negotiated wages, scheduling[,] and other working conditions on behalf of Local 229 with the Borough," "represented fellow Union members by filing grievances on behalf of Local 229's members including himself," and "criticized some of the Borough's management practices on behalf of Local 229." (Id. ¶ 17).

Rivers' claims center on two sets of events, the first of which occurred in 2017. Rivers alleges that, on January 10, 2017, he attended a civil service hearing in his capacity as Union Steward. (See id. ¶ 28). At the hearing, Rivers criticized the Borough for administering a civil service test with incorrect answers and scores which were changed after the test. (Id.) Rivers requested that the results of the test be discarded and that another test be given. (Id. ¶ 31). Rivers avers that, "[i]nstead

---

[1] Rivers' amended complaint eliminates some facts, reorganizes others, and removes a defendant (the Borough's solicitor), but it is otherwise generally the same as the original. (Compare Doc. 1 with Doc. 26). Accordingly, the summary that follows largely tracks that set forth in our first Rule 12(b)(6) opinion. See Rivers v. Borough of Olyphant ("Rivers I"), No. 3:20-CV-246, 2020 WL 5993768, at *1-2 (M.D. Pa. Oct. 9, 2020). To the extent background facts set forth in the amended complaint are inconsistent with the Rule 56 record that has since been developed, (see, e.g., Doc. 26 ¶ 16 (Rivers has been Union Steward since 2012); Doc. 39 ¶ 9 (Rivers has been Union Steward since 2008)), we rely on the facts set forth in the amended complaint for purposes of our Rule 12(b)(6) analysis.

2

of honoring the Civil Service Agreement, the Borough retaliated against Officer Rivers by hiring a new full-time probationary officer in violation of the CBA's process,"[2] (id. ¶ 33), and that the Borough "took such action to retaliate against Officer Rivers for speaking out on a matter of public concern: fair and accurate civil service testing," (id. ¶ 35).

Rivers' amended complaint also addresses events that took place in September and October 2019. On September 4, 2019, the Borough permitted newly hired probationary police officers to bid shifts in a manner that Rivers believed was inconsistent with the shift-bidding process established in the CBA, prompting him to file a grievance. (See id. ¶¶ 18, 22). According to Rivers, the Borough's actions violated his seniority rights and cost him 90 shifts. (See id. ¶ 21). Rivers alleges that Chief DeVoe retaliated against him for filing the grievance "by writing to Council demanding that Officer Rivers be punished," (id. ¶ 23), and that Chief DeVoe also warned him "not to file the grievance, stating 'once you go down this path, there's no turning back,'" (id. ¶ 24). Rivers attaches to his amended complaint a letter from Chief DeVoe to Borough Council dated September 8, 2019, in which Chief DeVoe alleges an ongoing shift-scheduling violation by Rivers and defers to the Borough

---

[2] Rivers' initial complaint alleged that the new full-time probationary police officer "started on or around June 4, 2017." (See Doc. 1 ¶ 29). That allegation has been eliminated from Rivers' amended complaint, which provides no information about when the hire occurred. (See Doc. 26 ¶ 33). The phrasing of Rivers' amended complaint suggests, however, that he raised this dispute in a grievance and that an arbitrator issued an award in his favor in July 2017. (See id. ¶¶ 33-35). We thus assume the allegedly retaliatory hire occurred sometime in the first half of 2017, as was initially alleged.

3

on the matter of appropriate punishment.  (See Doc. 26-3).  The Borough issued a written warning to Rivers on October 3, 2019.  (Doc. 26 ¶ 25; Doc. 26-4).

Rivers also complains about a five-day suspension he received around the same time.[3]  (See Doc. 26 ¶ 26; Doc. 26-5).  The suspension evidently dealt with what time Rivers was allowed to leave his shift.  Rivers alleges he had a longstanding practice of leaving his shift at 6:30 a.m.  (Doc. 26 ¶ 26).  The Borough suspended him for five days for leaving at this time.  (See id.; Doc. 26-5).  Rivers filed a grievance regarding this suspension on October 8, 2019.  (Doc. 26 ¶ 27; Doc. 26-5).

Rivers commenced this action on February 14, 2020.  He asserts claims for violation of his First Amendment rights to freedom of association and freedom of speech against both defendants, and claims for maintaining an unconstitutional custom or policy and failure to train against the Borough.  Defendants moved to dismiss Rivers' complaint pursuant to Rule 12(b)(6), and we granted that motion with leave to amend.  Rivers promptly filed an amended complaint, and defendants responded with another motion to dismiss, which is now fully briefed and ripe for disposition.  Also pending is defendants' motion for summary judgment.[4]

---

[3] The amended complaint does not specify when the Borough imposed this suspension.  Because it is immaterial to our decision, we note without adoption that the summary judgment record establishes October 3, 2019, as the notice of suspension date.  (See Doc. 39 ¶ 6; Doc. 45 ¶ 6).

[4] Rivers asks us to deny defendants' pending motion to dismiss as moot in light of defendants' fully briefed motion for summary judgment.  Defendants request that we take their motion to dismiss up first.  Because at least some of the issues raised in defendants' motion to dismiss are threshold legal questions, we elect to address the motion to dismiss first.

4

## II. <u>Legal Standard</u>

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6). When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)). In addition to reviewing the facts contained in the complaint, the court may also consider "exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). To test the sufficiency of the complaint, the court conducts a three-step inquiry. See Santiago v. Warminster Township, 629 F.3d 121, 130-31 (3d Cir. 2010). In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" Id. at 130 (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)). Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal

5

conclusions may be disregarded. Id. at 131-32; see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief." Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 556. A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

## III. Discussion

Rivers' amended complaint renews and partially recalibrates the First Amendment retaliation claims asserted in his initial complaint. Defendants argue the amended pleading fails to cure the factual and legal deficiencies identified in the court's first Rule 12(b)(6) opinion. We agree.

### A. Free Association & Free Speech

We evaluate Rivers' free-association and free-speech claims under the same set of elements. A plaintiff alleging retaliation based on exercise of either of these First Amendment rights must allege that (1) they engaged in "constitutionally protected conduct," (2) the defendant took "retaliatory action sufficient to deter a person of ordinary firmness from exercising [their] constitutional rights," and (3) there is a "causal link" between the protected conduct and the retaliatory action. Baloga v. Pittston Area Sch. Dist., 927 F.3d 742, 752 (3d Cir. 2019) (quoting Palardy v. Township of Millburn, 906 F.3d 76, 80-81 (3d Cir. 2018)). Although governed by the same rubric, Rivers' "pure" association claim based on union membership

6

"must be analyzed separately" from his free-speech claim arising from particular union-related speech. See id. at 748-49 (citing Palardy, 906 F.3d at 80-81).

1. *Free Association*

As we acknowledged in our initial Rule 12(b)(6) opinion, "[p]lainly efforts of public employees to associate together for the purpose of collective bargaining involve associational interests which the first amendment protects from hostile state action." Labov v. Lalley, 809 F.2d 220, 222–23 (3d Cir. 1987). "And because a union's ability to file grievances on behalf of its members is essential to its collective bargaining power, retaliation against a union leader for the union's decision to file a grievance—*as distinct from retaliation based on the substance of the grievance*—constitutes retaliation based on association rather than on speech *per se*." Baloga, 927 F.3d at 754 (citations omitted) (emphasis added).

We glean three potential free-association theories from Rivers' amended complaint: *first*, that the Borough retaliated against Rivers for appearing in his capacity as Union Steward at a January 10, 2017 hearing to criticize the Borough's civil service test procedures by hiring a new full-time probationary police officer, (see Doc. 26 ¶¶ 28-35); *second*, that, on September 4, 2019, the Borough allowed newly hired probationary police officers to bid shifts in a manner inconsistent with the CBA to retaliate against Rivers for his role in the bargaining process that led to

those shift-bidding procedures, (see id. ¶¶ 18-20)[5]; and *third*, that the Borough disciplined Rivers in retaliation for filing a grievance concerning the perceived violation of the CBA's shift-bidding procedures, (see id. ¶¶ 22-26).

Rivers' claim premised on the January 2017 civil service hearing and the Borough's hiring of a new full-time police officer continues to suffer from the same defects identified in our first Rule 12 opinion. As we observed then, appearing at a civil service hearing in one's capacity as union steward would constitute protected association activity for First Amendment purposes. See Rivers I, 2020 WL 5993768, at *4. However, because Rivers commenced this action in February 2020, any claim relating to alleged retaliation during 2017—*viz.*, the purportedly retaliatory hire of a new full-time probationary officer—is barred by the two-year statute of limitations applicable to Section 1983 claims. See id. at *4 n.2 (citing Garrett v. Wexford Health, 938 F.3d 69, 84 n.19 (3d Cir. 2019)). And to the extent Rivers posits the Borough's conduct in September and October 2019 as the alleged adverse action, the amended complaint, like the original, fails to establish a causal link between his protected activity in 2017 and the alleged retaliation more than two and a half years later. See id. at *4 (citing Baloga, 927 F.3d at 759-60 & n.15; Briggs v. Potter County,

---

[5] It appears Rivers may have abandoned this allegation as freestanding theory of free-association liability, since there is no reference to it in his Rule 12 opposition brief. (See Doc. 33 at 4-12, 16-18). The theory is also absent from Rivers' Rule 56 opposition brief, which restricts the claimed retaliatory action to "Chief DeVoe's September 8, 2019 recommendations of write-up as well as the Borough's October 3, 2019 write-up and notice of suspension" and links the alleged retaliation to his September 4, 2019 grievance. (See Doc. 44 at 9-14). Defendants' motion is thus unopposed as to this claim. In the exercise of caution, and because we will deny leave to amend at this point, we nonetheless assess this theory under the applicable Rule 12(b)(6) standard.

8

787 F. App'x 123, 130-31 (3d Cir. 2019) (nonprecedential)). Finally, as before, Rivers' only allegations of general antiunion animus are comments he claims Chief DeVoe made in September 2019, but Rivers once more tethers those comments directly to his grievance filed that same month, not to his January 2017 hearing appearance. See id. at *5; (see also Doc. 26 ¶ 24). Thus, to the extent Rivers avers the Borough retaliated against him for union leadership activities in January 2017, his claim remains both time-barred and factually deficient.

Rivers' next claim—that the Borough retaliated against him for his role in the collective bargaining process by allowing newly hired probationary police officers to bid shifts in a manner inconsistent with the CBA's shift-bidding procedures—is similarly hollow. Rivers alleges he negotiated the shift-bidding process on behalf of the union. (See Doc. 26 ¶ 19). Union leadership activities of that nature are protected by the First Amendment and may form the basis of a "pure" association claim. See Baloga, 927 F.3d at 754-55 (citations omitted); see also Palardy, 906 F.3d at 84. Rivers' claim nonetheless fails on the causation element: the amended complaint alleges no facts whatsoever to support Rivers' cursory allegation that the Borough deliberately violated the CBA's shift-bidding process to retaliate against him for his role in developing that process. (See Doc. 26 ¶¶ 18-20). He does not tell us when he engaged in the shift-bidding negotiations on behalf of the union, foreclosing any inference of retaliatory motive due to "unusually suggestive" temporal proximity. Cf. Baloga, 927 F.3d at 759. And he provides no information about the weeks or months preceding the alleged CBA violation demonstrating a "pattern" of antiunion antagonism. Cf. id. We simply cannot take the quantum

9

inferential leap Rivers asks of us—to do so would transform every alleged employer violation of a CBA into a First Amendment retaliation claim by the union leaders who negotiated it. This theory too fails to state a free-association claim for which relief may be granted.

Rivers' third argument has already been considered and rejected by this court. Rivers claims the Borough retaliated against him for grieving its alleged violation of the CBA's shift-bidding process. (See Doc. 26 ¶¶ 22-27). Rivers avers that the change cost him 90 shifts; that he filed a grievance disputing the change on September 4, the day it occurred; that Chief DeVoe wrote to Borough Council on September 8, requesting that Rivers be punished for what Chief DeVoe perceived to be Rivers' own violations of the shift-bidding rules; that Chief DeVoe warned Rivers not to file the shift-bidding grievance, stating "once you go down this path, there's no turning back"; that the Borough issued a written warning to Rivers on October 3, 2019, based on the allegations in Chief DeVoe's September 8 letter; and that the Borough also suspended Rivers for five days for his "long-standing past practice" of leaving his shifts early. (See id.; Docs. 26-2, 26-3, 26-4).

We previously held that these allegations go to Rivers' free-speech claim, suggesting he may have been retaliated against "because of his advocacy on a[] particular issue," namely, the shift-bidding change. See Rivers I, 2020 WL 5993768, at *5 (quoting Palardy, 906 F. 3d at 81) (alteration in original). But we found they do not form the basis of a pure association claim—that is, they do not permit an inference that the Borough retaliated against Rivers "simply because of his union membership." See id. (quoting Palardy, 906 F.3d at 81).

10

Rivers attempts to sidestep our earlier holding by eliminating from his amended complaint his prior averment that he "was the only officer negatively impacted" by the shift-bidding change, (cf. Doc. 1 ¶ 45), and claiming in his brief that he was grieving the shift-bidding issue as "the voice and leader of" and "on behalf of Local 229," (see Doc. 33 at 10). Recasting Rivers' grievance to incorporate his position with the union does not change the result. Rivers' grievance raised a personal concern and involved a discrete issue. (See Doc. 26-2 at 1 ("On 9/04/19 *this officer's seniority* was violated and will continue to be violated until the newly-hired probationary officers complete their 90 shifts of probation and are allowed back into the union." (emphasis added)); see also Doc. 26 ¶ 21 (alleging he "lost ninety (90) shifts" due to shift-bidding change)). At its core, Rivers' claim remains that the Borough retaliated against him for a single instance of advocacy on a particular issue that purportedly had an outsized impact on him. See Rivers I, 2020 WL 5993768, at *5 (quoting Palardy, 906 F.3d at 81); (Doc. 26-2). Like his other theories, his pleading on this point is devoid of any allegation, beyond conclusory assertions, that the Borough was motivated by general anti*union* sentiment or an animus against the union's members or leaders. Cf. Baloga, 927 F.3d at 749-50, 755 (associational claim based on evidence of animus toward union and its leader implicated rights "in a *different way* and to a *different* degree" than speech claim based on grievance specific to denial of paid holiday); Palardy, 906 F.3d at 84 (no freestanding speech claim when plaintiff did not allege retaliation based on "speech or advocacy on any particular issue" but instead only "because he was a union man"). Rivers' free-association claim based on his grievance is thus "co-extensive

11

with" his free-speech claim based on the same, and must again be dismissed. See Palardy, 906 F.3d at 84; see also Rivers I, 2020 WL 5993768, at *5.

### 2. *Free Speech*

Defendants interpret Rivers' amended complaint as asserting two speech activities: Rivers' January 2017 civil service hearing testimony and his September 2019 shift-bidding grievance. (See Doc. 28 at 9-13). In his Rule 12 opposition brief, Rivers confines his free-speech claim to the 2017 testimony alone. (See Doc. 33 at 16-18). Yet in his Rule 56 opposition brief filed roughly five months later, Rivers pursues only the September 2019 grievance as the basis for his free-speech claim. (See Doc. 44 at 14 & n.2). We consider both theories in assessing whether Rivers has pled a viable free-speech claim. We conclude he has not, for largely the same reasons articulated in our first Rule 12(b)(6) opinion.

With respect to alleged retaliation for his January 2017 testimony, Rivers again fails to plead causation. See Rivers I, 2020 WL 5993768, at *6-7. Absent direct evidence, a plaintiff can show causation by alleging "unusually suggestive" timing between the protected speech and the retaliatory action or "a pattern of antagonism coupled with timing." See Baloga, 927 F.3d at 759 (quoting Lauren W. *ex rel.* Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007)). Rivers' amended complaint alleges neither. The only adverse action he identifies within the limitations period is discipline in September and October 2019, but that conduct is separated by more than *two and a half years* from his testimony in January 2017 and is not "unusually suggestive." See, e.g., Watson v. Rozum, 834 F.3d 417, 423 (3d Cir. 2016) (two years between protected activity and adverse action "is just too remote to suggest a

12

retaliatory motive"); cf. Baloga, 927 F.3d at 760 n.15 (one week between protected activity and retaliatory transfer unusually suggestive, whether on its own or together with "evidence of . . . animus toward the union more generally").

Rivers also fails to allege a "pattern of antagonism" between 2017 and 2019 that could pair with timing to permit a causal inference. The Third Circuit Court of Appeals has explained that

> [w]here the time between the protected activity and adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee, or other types of circumstantial evidence, such as inconsistent reasons given by the employer for terminating the employee or the employer's treatment of other employees, that give rise to an inference of causation when considered as a whole.

Marra v. Phila. Hous. Auth., 497 F.3d 286, 302 (3d Cir. 2007) (internal citation and accompanying text omitted). In our first opinion, we found Rivers had identified "two temporally distinct clusters of events"—the events in 2017 and those in 2019—and failed to causally link them. See Rivers I, 2020 WL 5993768, at *6. This deficiency fells Rivers' new pleading as well. The only "fact" he supplies about this intervening period is that, sometime in the first half of 2017, see *supra* at n.2, the Borough hired a new full-time probationary officer, a decision Rivers speculates was retaliation for his 2017 speech, (see Doc. 26 ¶ 33). He provides no factual information from which the court could reach this same conclusion, nor does he allege "actual antagonistic conduct or animus" or any other indicia of retaliatory intent in the approximately 33 months separating his January 2017 speech and

13

the purported retaliation in September 2019.  Cf. Marra, 497 F.3d at 302.  Because Rivers has failed to cure the deficiencies in this theory of liability, we must again dismiss it.

Rivers also claims he engaged in protected speech when he grieved a perceived seniority violation (the shift-bidding change) on September 4, 2019, and that he was retaliated against when the Borough issued a written warning to him just 29 days later, and temporarily suspended him just five days after that.  (See Doc. 26 ¶¶ 18-24).  This claim too continues to suffer the same defect that compelled its dismissal on initial review: an internal scheduling dispute is not a matter of public concern entitled to First Amendment protection.

We set forth the standard for assessing whether public employee speech is constitutionally protected in our first Rule 12(b)(6) opinion in this case.  See Rivers I, 2020 WL 5993768, at *5.  As we observed then, public employees do not forfeit the First Amendment right to speak on matters of public concern by virtue of public employment.  See Connick v. Myers, 461 U.S. 138, 142 (1983).  That right, however, must be balanced against the public employer's interest in the effective discharge of its public duties.  Id.  Not all public-employee speech is protected by the First Amendment; therefore, a public employee asserting a First Amendment speech violation must allege speech that is in fact protected by the Constitution.  See Baldassare v. New Jersey, 250 F.3d 188, 195 (3d Cir. 2001).

For a public employee's speech to be protected by the First Amendment, it must be on a matter of public concern, and the employee's interest in the speech must outweigh the interest of the employer in efficiently conducting its operations.

14

See Connick, 461 U.S. at 146-54; Baldassare, 250 F.3d at 194-95. Whether speech meets these dual requirements is a question of law to be resolved by the court. See Baldassare, 250 F.3d at 195. In determining whether a statement was on a matter of public concern, context matters greatly: courts must consider "the employee's motivation as well as whether it is important to our system of self-government that the expression take place," Munroe v. Cent. Bucks Sch. Dist., 805 F.3d 454, 467 (3d Cir. 2015) (citing Azzaro v. County of Allegheny, 110 F.3d 968, 978 (3d Cir. 1997) (*en banc*); Versarge v. Township of Clinton, 984 F.2d 1359, 1364-65 (3d Cir. 1993)), by looking to "the content, form, and context" of the statement in question, see id. (quoting Miller v. Clinton County, 544 F.3d 542, 550 (3d Cir. 2008)). Our court of appeals has explained that, generally, "[p]ersonal grievances, complaints about conditions of employment, or expressions about other matters of personal interest . . . are matters more immediately concerned with the self-interest of the speaker as employee." Palardy, 906 F.3d at 83 (citation omitted) (second alteration in original); see, e.g., Thomas v. Del. State Univ., 626 F. App'x 384, 388-89 (3d Cir. 2015) (nonprecedential) (citations omitted) (union member grievances concerning "working conditions and other issues in union members' employment" were "personnel matters," not "issues of interest to the broader community"); Dondero v. Lower Milford Township, 431 F. Supp. 3d 590, 600 (E.D. Pa. 2019) (union member complaints about issues with other employees and for assistance with disability payments were "concerned about the self-interest of [plaintiff] rather than the bargaining unit").

We again agree with defendants that River's September 2019 grievance was not a matter of public concern.[6] His speech concerned scheduling disputes within the police department, with no apparent implications for the community at large. It is clear that Rivers' chief concern was with the personal implications of losing 90 shifts because of the shift-bidding change. (See Doc. 26 ¶ 21; see also Doc. 26-2). Rivers offers no facts in his amended complaint or in any of his briefing that would elevate this internal, self-interested dispute to a matter of public concern. Indeed, he has eliminated from his amended complaint the only allegation that previously gave the court pause: his prior allegation that shift-bidding changes have some taxpayer implications because they may impact the Borough's obligation to pay overtime is now absent from his amended complaint, (compare Doc. 1 ¶ 34 with Doc. 26), and it is not revived in Rivers' Rule 56 briefing or Rule 56.1 statement of material facts, (see generally Docs. 44, 45). Because Rivers' speech is not alleged to have touched on matters of public concern, it is not constitutionally protected.[7] We will thus grant defendants' motion to dismiss this aspect of Rivers' free-speech claim as well.

---

[6] We note that Rivers fails to respond to this argument in his Rule 12 opposition brief, and the court has discretion to deem the argument unopposed. In the exercise of caution, we address the question on its merits.

[7] The case on which Rivers relies to support his public-concern argument, Lahovski v. Rush Township, 441 F. Supp. 3d 43 (M.D. Pa. 2020), is analogous solely to the extent both cases involve police officers. The case otherwise stands in stark contrast to the internal scheduling dispute in this matter: Lahovski involved, *inter alia*, public-employee speech about allegedly illegal attempts to decertify a police union. See Lahovski, 441 F. Supp. 3d at 57-58. The court found that plaintiffs had plausibly alleged, for Rule 12 purposes, that speech of such nature is of public concern. See id.

### B. Municipal Liability

Rivers reprises two municipal-liability claims against the Borough: he avers that the Borough "developed and maintained a number of deficient policies and/or customs which caused the deprivation of [his] constitutional rights," (Doc. 26 ¶ 42), and that the Borough failed to adequately train its employees, causing them to violate his constitutional rights, (id. ¶ 45). We set forth the standards for assessing such claims in our prior opinion, and we incorporate those standards herein. See Rivers I, 2020 WL 5993768, at *7-8 (citations omitted). We observe as a threshold matter that Rivers has done nothing to remedy the lack of factual support for his municipal-liability claims. See id. at *8; (see also Doc. 26). But we will dismiss these claims without addressing those arguable defects because they again fail for a more fundamental reason: lack of underlying constitutional harm. See Rivers I, 2020 WL 5993768, at *8.

As we previously explained, constitutional injury is a prerequisite for a municipal-liability claim; that is, absent an underlying deprivation of a plaintiff's constitutional rights, municipal liability cannot lie. See Mulholland v. Gov't Cnty. of Berks, 706 F.3d 227, 238 n.15 (3d Cir. 2013) (citations omitted); Startzell v. City of Philadelphia, 533 F.3d 183, 204 (3d Cir. 2008) (quoting Brown v. Commw. of Pa., Dep't of Health Emergency Med. Servs. Training Inst., 318 F.3d 473, 482 (3d Cir. 2003)). While it is possible for a municipality to be held liable even when none of its employees are, "there still must be a violation of the plaintiff's constitutional rights." See Brown, 318 F.3d at 482 (citing Collins v. City of Harker Heights, 503 U.S. 115, 122 (1992)). We held *supra* that Rivers fails to plead a First Amendment

17

violation based on his union affiliation, leadership role, or any protected speech. Without an underlying constitutional violation, his municipal-liability claims also fail. See Mulholland, 706 F.3d at 238 n.15 (citations omitted); Startzell, 533 F.3d at 204 (quoting Brown, 318 F.3d at 482). We will grant defendants' motion to dismiss Rivers' claims against the Borough.

### C. Leave to Amend

The Third Circuit Court of Appeals requires district courts to grant leave to amend in civil rights cases if a curative amendment is conceivable. See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002). Some of the deficiencies identified in Rivers' complaint are legal in nature and thus cannot be cured by an amended pleading. To the extent the deficiencies are factual—*e.g.*, failure to plead causation—we note that we have already once granted leave to amend, to no avail. We also have reviewed the pending summary judgment record, which fails supply what the complaint lacks. For example, Rivers testified during his deposition that, while he *suspects* based on the circumstances that Chief DeVoe and the Borough acted with retaliatory intent, he has no evidence that their actions were motivated by either antiunion or antispeech animus. (See Doc. 46-1, Rivers Dep. 76:24-85:23). Rivers also has not pointed the court to any evidence suggestive of a pattern of "actual antagonistic conduct or animus," see Marra, 497 F.3d at 302, which could causally connect the events in 2017 to those in 2019, (see generally Docs. 44, 45). We therefore conclude that granting leave to amend for a second time would be futile.

## IV. Conclusion

For the reasons set forth herein, the court will grant defendants' motion to dismiss Rivers' amended complaint for failure to state viable First Amendment claims and deny defendants' pending motion for summary judgment as moot. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated: June 30, 2021